If I may please the court, Tom Geisens on behalf of Mr. Samuels. We can hear you, that's not, that works. Stereophonic. Yeah, anyway, stereophonic, there we go, thank you. This case is an appeal from a summary judgment and it raises an issue in the duties of a cruise line as well as the obligations of a cruise line and this case was when Mr. Samuels was unfortunately waiting in a very calm place of water on a beautiful day in Cabo San Lucas, had been directed to a beach called Lover's Beach and when he was there he went in the water on one side of this peninsula and the Sea of Cortez sign in the water waited around a little bit, crossed over to the Pacific Ocean side and as the records indicate went waiting in that area on two occasions. On the second occasion there was a great wave or upheaval of water that threw him in some fashion that he landed on his head and obviously he suffered a very serious injury which is that he has to exist with at this particular time. I notice it says he's a high-functioning quadriplegic. What does high-functioning mean? Well he's actually very fortunate in the sense that first he couldn't move his extremities but then as time passed he is able to ambulate and semi care for himself so he's, you know, but he can't, doesn't have much energy. He spends an awful lot of time with the doctors and then there's a, at this point in time, nerve rejuvenation which is very painful and one of the things that he can't, he's not very functional but he's, you know, he lives in a house and can maintain himself and he has a He's not what I would normally consider a quadriplegic, someone who can't move any limbs. That's correct. He's not in a wheelchair and he doesn't have to have an in-care person take care of him. We don't think. His children have been with him up until this time. Right, but obviously when he was flipped over by the waves, his head, he must have gone straight down and hit his head on the bottom of the ocean and caused this nerve damage. It's a really freakish kind of accident, isn't it? Very, well, freakish but I mean I guess, you know, when you get thrown around in water and don't have any control of what's happening, you're not sure what the result's going to be. I mean he was in the water and that's what was so surprising. I mean because he was in three or four feet of water and he was not in the surf. The surf was farther out. He was between the surf and the beach itself when he was standing there. So, and so in this particular case, as the cases indicate, the cruise line does have a duty to his passengers if they go to shore to warn them of any known dangers, especially if they send them to some particular place. Why should we view this as a known danger? I think it should be viewed as a known danger based upon the testimony of the two witnesses that were excluded. How did they know it was a known danger? They know it as a known danger because, I think, I believe as Miss Larson probably addressed it more clearly, but because of the nature of this beach and the location of this beach, as she indicates, since she's been going there for over 30 years or 30 years approximately. Had she ever been injured? She had never been injured, no. Had she ever seen an injury? She had never seen an injury. Is there any report, anything in the record with regard to reports of numbers of injuries suffered at that beach or how it compares to other beaches? There is none, there's none, Your Honor. What did the cruise line produce with regard to the information it had about that beach? The cruise line had no information about that beach. So why is this a known danger? I think it's a known danger by reputation. Well, see, I have trouble with that. By reputation based on what? To begin with, I don't know how either of these purported experts qualify to have personal knowledge with regard to what the reputation is since neither one of them knew what the reputation was until they started looking around for it. Well, I think that what it is, it would be comparable, Your Honor, to like the Carlisle case where there was knowledge of a very dangerous area for people to send people around on the island. And how was the knowledge established? Because the ship, in that particular case, the crew members of the vessel as well as the cruise line had knowledge that Do you have any evidence of that nature here? I don't have any evidence of that nature. So how does it qualify like the Carlisle case? Well, because that knowledge is available for people who Well, see, I accept the proposition that someone with knowledge may have an obligation to give it, but there is nothing here that I've seen in the record that either A, demonstrates that Highland America had actual knowledge, or B, demonstrates a danger of such level that they have to be presumed to have it or to have obtained it somehow. There's just nothing. All I see is two people whose qualifications are suspect saying, Well, there's a reputation in the industry. How does that establish that this defendant knew or should have known of danger? Your witnesses didn't know of the danger until they purported to inquire. Well, the witnesses that we had were in industries, and when they Mr. Hutchinson went on the Internet and purported to find some things. He doesn't have personal knowledge of any of that. I can go on the Internet. Does that make me an expert witness in whatever things I can look up on the Internet? No, but it's the issue of Mr. Hutchinson. Let me just go back to that for a minute. He was involved in creating tours for people on vessels. And from that, he had no knowledge. If he had actual knowledge with regard to this beach, he would have related it. He had to go look it up someplace else. So how does that make him an expert on the danger of this beach? I think, Your Honor, that Mr. Hutchinson indicated when he was with the cruise lines down there in the Cabo San Lucas area and he was establishing programs, that they found that knowledge and had that knowledge and warned individuals of going to that beach and not going to the Pacific Ocean side of the beach. And that's because that was his obligation when he was in the position for the cruise lines that he was working for in that area. I don't think he said what you just told me. And what did he base that upon? What danger did he know of? Had he seen any injury at this location? No, he's not seen any injury at this location. He didn't even know about whether there were signs, right? Correct. And he had done no research about what happened in the industry since he wasn't a part of it in 2000? I think that in his declaration, Your Honor, you'll see that he talked to a lady that was presently still going down there on cruise lines, and she indicated that they still use the same standard of protocol for people that are going. That's the phone call he made? Yes. Did he give us any written material to substantiate the opinion? No. I mean anything that we could have that would. . . Did he contact the cruise lines about the condition? No, he didn't contact other cruise lines. No, he did not contact other cruise lines. He worked for two different cruise lines. He didn't contact any cruise lines about that. All I found was one hour on the Internet and a few telephone calls. Well, and his experience, I mean, I would assume that if you look at Ms. Larson's testimony and she said that she's been known of this problem for the 30 years that she's been in the tourist industry, he knew. . . Well, Larson, if we turn to Larson, which you've now jumped from Hutchinson, she worked in the travel industry for a long time, never for a cruise line, didn't know what information relied on to get her conclusions. She was one time at Caba, one time to Lover's Beach, did not provide any written support for opinions. Now, that's the way I went through it. I'm just trying to put together what it is that I had. Now, what is my standard of review for the good court who's now determining whether they're going to testify to the jury? Well, I think that . . . What's the standard of review that I have for the district court who's now going to be determining whether these people should talk to the jury? Well, that's whether or not the court abuses discretion. Yeah, and not only just abuses discretion, but here we talk about broad discretion in assessing the relevance and reliability of the expert testimony. I guess I'm trying to figure out how you want me to tell this good trial judge based on what you and I have agreed are the facts, that he just plain is wrong. Well, I think that the . . . If you have this testimony of these two individuals, I believe it raises an issue of fact that should be that whether or not Holland America, under these circumstances, should have known of the dangers at this beach. And subsequently, if they're going to send people to this area, that they tell them that you should not go in on the Pacific Ocean side of the beach. What's odd, though, is that the testimony . . . I understand the proof is that according to the declaration of the Holland America fleet security person, 96,000 people visited this beach or visited the location in 2008 alone, and yet they don't have a single report of any accident or injury at Lubbers Beach. I mean, so what is it that puts Holland America on notice, in other words? I mean, we don't have in the record that I've seen a single person other than your client who's ever been injured on the Pacific side of Lubbers Beach. Well, this warning about this beach existed well before my client ever was injured. How is there evidence of that? What evidence is there of that warning? Ms. Larson would be the . . . All Ms. Larson says is I traveled there first in 1976, and I've known since then it was dangerous. Just a flat declaration without any kind of support whatsoever, or any statement that indicates that she would know. She was a travel agent. She wasn't in the cruise industry. She went there herself. She didn't see anything, but she knows it's dangerous. Well, you can get anybody to say anything is dangerous, but that's not evidence. There's no personal knowledge for that statement. There's no foundation for that statement. The . . . I mean, I guess when I'm looking at her affidavit at this point in time, and she says that she's been going there since 1976 and had made numerous . . . had taken numerous groups of people . . . Her statement is paragraph 4. I have been aware since I first traveled to Cabo San Lucas in 1976 that entering the water in any way in the Pacific Ocean side of Lubbers Beach is extremely dangerous. There is no elaboration as to the basis for that knowledge. And I've got to tell you, a travel agent from the state of Washington isn't ordinarily deemed an expert on the conditions in a beach in Mexico. I would say that. I think that, as she indicated or anybody would recognize, I think that people in the travel industry have an obligation when you go see them, if they send you someplace to make some efforts to make sure that you don't go into a dangerous area. From the record, we can't tell that this isn't the most benign beach in Mexico. As far as we know, one person ever was injured there. So . . . Then I have . . . if that's . . . I don't have anything other to say than . . . We didn't make the record. I mean, can you point me to anything else that gives proof to the notion that this beach is dangerous? I have nothing other than what you have in front of you. Well, you know, how would you distinguish this from the case, I believe, cited by the district court Isbell v. Carnival Corporation, which is the Southern District of Florida 2006 case, where the woman goes on a shore excursion in the rainforest and gets bitten by a snake. And she says, Aha, Carnival, you didn't warn me. And the judge said, Look, it's open and obvious that when you go in a rainforest, there are creatures there, and a snake is one of those creatures. They didn't have to warn you. Is this any different? Well, I think that in that particular case, there was a conversation allegedly between the person who had the snake bite and so forth, and the court. And I think that she asked about any conditions, and they said there was no conditions that they knew of that was dangerous. And she went on the trip. But I would assume, and I don't disagree with you, that where you drift down a river in a rainforest someplace, that you might well encounter a snake bite or something in that type of area. Well, I mean, you go into the ocean, whether it's Hawaii or California or the Atlantic Ocean, I mean, undertoes and currents and waves, I mean, aren't they open and obvious? I mean, that's what the district judge said. Well, the open and obvious, the case was cited by Seminole, the one in New York, where the fellow had been told it was rough weather, and he went in the water on several occasions under 8- and 10-foot swells or something to that extent and was injured when he was exiting the water. And in that particular case, I agree that that would be open and obvious, that the water is quite rough and quite dangerous at that point in time. Your client is from California, correct? That's correct. I have a California case, Princess Hotels International, where a princess hotel was out there on the oceanfront in Mexico. Two guests were, one was killed, one was injured while they were swimming in the ocean at the hotel's beach. And in this case, Princess Hotels, the court said the hotel had no duty to warn of dangerous conditions over which it had no control, the ocean currents. I understand, and that's the law, Your Honor, in California? Well, in Washington, I didn't sign any difference. I went to Washington law, and I look at Washington law. It says no duty to warn unless they know or by exercise of reasonable care would have discovered. And so, therefore, I look at the evidence to determine it, and I still am caught. If I go to Florida, where all these guys usually make you go to court, they have the same kind of cases, the snake case, the dune buggy case. I'm trying to find the case to help you. Well, I mean, we think that Cesaris helps us in the Ninth Circuit. The case here that was in Hawaii. What's the name of that case? Cesaris, T-A-R-I-S, T-A-R-S-H-I-S, I believe, versus Lahaina Investments. But that's a little bit different because in that case, the Lahaina Investment Corp. had advertised that the beach was safe for swimming. I mean, they'd advertised it, and that was a difference because they were out there saying it was safe, and then it wasn't safe. That isn't the case in this case. No, but that case, I thought, stood for that the court recognized it was a jury question of whether or not. Well, they said a jury question because the hotel had gone out and specifically said, It's safe here. That's why there was a jury question. If they hadn't have said anything, they wouldn't have had a jury question, would they? Well, it might have been based upon their testimony because they said they had warning flags up, and the lady testified she didn't see the warning flags and so forth, or the writing that went with it. I understood that they did advertise, and that was how the case developed, but I thought the court said as to the understanding of whether or not it was a dangerous condition, it was open and obvious with a jury question for the factual issue as far as entering the water. I guess I'll save the rest of my time for rebuttal. Thank you. You're out of time. I'm sorry. You're three minutes over here. Am I three minutes over? Okay. I'm sorry. Thank you. Good morning. May it please the court, my name is Lou Shields. I'm the attorney for the appellees, Holland America Lines. Mr. Samuels had an unfortunate accident, but as your honors noted during Mr. Geisner's argument, it was a freak accident. The record was very clear that Holland America has been operating there for many years with no notice of any accidents at this particular beach. This is consistent with Mr. Samuels' own testimony where he said this accident could have occurred anywhere and acknowledged that it could have occurred back in his old home state of New York. The district court correctly concluded that a cruise line does not owe a duty to warn of open and obvious hazards and that there was no particular evidence of any hazardous condition here or prior accidents at this beach. Do we really need to go to open and obvious, or can we go with the proposition that unless one has knowledge or reasonably could have known, one has no duty to warn? Your honor, you are correct. That is the statement of correct law there. We could say, and you have no duty to warn of open and obvious hazards, but then you bring into existence, don't you, whether it's a question of fact whether this was open and obvious or whether it wasn't. You're correct. Then we have to decide that oceans are always open and obvious or oceans might be open and obvious, and therefore since he waded in there a couple of times, and it didn't for one time and no problem happened, it didn't seem so open and obvious. That's correct, your honor. So wouldn't we then drop back and say the real standard of review is when is there a duty to warn? Well, those two issues were both presented to the district court. The district court based its ruling on the open and obvious issue. It did state in a footnote that Holland America had established that it did not have any notice of prior incidents and that that was a compelling argument, but it wasn't the argument that the court was ruling on in dismissing the case on summary judgment. What do you do with the Tarsus case then? I think the Tarsus case, as your honor pointed out during Mr. Geisner's argument, is clearly distinguishable. That's a landowner case. But the issue that you just focused on, you said the district court focused on is the open and obvious. What would, in this case, the plaintiff have been able to realize? What the plaintiff would realize doesn't change whether or not the speaker owns the land or not. And what the court said in Tarsus is that whether or not the ocean fronting the property would have appeared dangerous to an ordinarily intelligent person is a question of fact and appropriate for summary adjudication. In the Tarsus case, though, there was evidence in the record that the hotel had noticed that there were dangerous conditions at that beach. Stop. I accept that, but with regard to the particular issue we're talking about, the open and obvious, what should plaintiff have been able to realize? I don't know how it matters at all what defendant knew. The point of Tarsus is that somebody standing at the beach, ordinary intelligence and so forth, isn't going to be able or it would be a question of fact as to whether that person could recognize dangerous conditions. There's a whole other set of issues with regard to the duty on defendant based upon what the defendant knows. But focusing now on the overt basis for the district court's decision, it does seem to me that Tarsus proposes some problem. Well, I think in this particular case, the beach where Mr. Samuels was swimming, to say that there was a hazard there is somewhat of a stretch. This is a public beach that is open and visited by many people daily. Mr. Samuels actually testified that there were 20 people swimming in the area where he was swimming. He had waded out into the area to chest deep water, had bobbed around in the waves for some time. All those things could be said as it happens. This is one of those rare cases where I know exactly what they're talking about in the Tarsus case because I've been on that beach lots of times. And I would have never identified that as a dangerous beach. And the court says whether an ordinarily intelligent person can recognize that it's dangerous is a question of fact. Tarsus is also distinguishable in the size of the wave that impacted the plaintiff in that case. The evidence in that case was that the guest at the hotel or at the beach in that particular occasion was aware of slight waves that had been present and was hit by a larger wave. Mr. Samuels specifically testified that the wave that he was involved in during his accident was just like all the others that had been coming through that morning as he was wading at Lover's Beach. Above the surface? Yes, sir. The problem with the ocean is that the real activity happens below the surface, and some waves turn out to have more powerful punch, which isn't visible, but undertow or whatever else could cause him to lose his balance and hit his head. So that, again, speaks to the question of what should someone be able to observe. That's what Tarsus seems to say is a question of fact. I would point your Honor to some other cases, particularly the Seminoe case, which is a beach case that talks about what someone is able to observe and the duty of someone operating that beach. In Seminoe, the waves were much larger than were involved in Mr. Samuels' case. They were described as 8 to 10 feet. The gentleman in that case had been swimming for quite some time. I guess that's why I worry. You keep talking about this wave and that wave and what's big and what isn't. That seems to go back again to what a question of fact would be. The question of fact in those kind of situations has to do with how big the waves are and how big they aren't and all of those kind of situations. And that's why I'm trying to steer you to other. If you want, I can't understand how this can't be a question of fact on open and obvious. Well, for starters, Your Honor, in Mr. Samuels' case, there was no evidence of this being a hazardous beach situation. There was no testimony from a beach safety expert. Mr. Hutchinson, the terminal manager here in Seattle, lacked any personal knowledge of this beach. He testified and acknowledged that he had no training in beach safety. He had never been to the beach. He was not aware of any signage on the beach, on the water taxis that took Mr. Samuels to this beach, or in the town that Mr. Samuels visited just prior to his accident. He hadn't been to Cabo in 10 years. Similarly, Ms. Larson is a travel agent and a retired one at that. There was no evidence here, no fact that was put before the court that there was an unsafe condition. Mr. Samuels had been waiting in the ocean for the better part of 20 minutes that morning with no problem. He happened to be looking at a boy that was going up a wave at the time, wasn't looking out for his own safety, and a freak accident occurred. Well, I think Judge Smith is suggesting you may be safer on the theory of lack of duty because of no notice of any hazardous condition than basing it on the open and obvious condition of the ocean, where there might be more of a fact question. Correct. There is no evidence of any notice to Holland America Line in this case. Its witnesses were deposed. Thirty-six depositions were taken. Both the Director of Risk Management, who had been in that position for 22 years, testified that he had never heard of any prior incident at this area. Charlie Mandego, who is the Director of Fleet Security, was also deposed, and he testified that he had never heard or seen any circulars from the State Department, notices from other cruise lines, or from governmental authorities that there is any particular hazard at this beach. It is a public beach that is open. It is readily trafficked daily. Local vendors take customers out there, like Mr. Samuels, drop them off, and it's a public beach. Holland America Line cannot be the guarantor of every beach in the world in the over 300 ports that it visits. That would be an unfair standard to apply to the cruise lines. I'm looking here at part of Exhibit A to Mr. Hutchison's declaration, and one of the things is the Los Cabos Guide, Lover's Beach, and the statement here says, Be most careful here. The powerful waves and currents of the Pacific make swimming quite dangerous. Swimming and snorkeling should only be attempted on the Sea of Cortez side of Lover's Beach. Now, why do they have statements like this from the Los Cabos Guide, and yet supposedly your client has never had any complaints and has no knowledge of it being dangerous? Somebody who's local there thinks it's dangerous. Two points on that, Your Honor. I think you can pretty much find virtually anything on the Internet these days, but more importantly, the Exhibit A to Mr. Hutchison's declaration, there is no evidence in the record that that was even in existence at the time of Mr. Samuel's accident. Mr. Hutchison didn't know that it was in existence at that time. Additionally, Charlie Mandego, the Fleet Security Supervisor, as well as Mr. Arendelle, Risk Manager for Holland America Line, testified that they had not seen any of these warnings. They also testified that when they do receive reports of problems in ports, they publish it to their guests in the Daily Circular, which Mr. Samuel's received. That Daily Circular, which is in evidence, did not provide any warning of Lover's Beach because the company had not had any notice of any prior incidents there. Even Mr. Samuel's own expert, who says that he had worked down in Cabo ten years before, stated he was unaware of any accidents occurring there. But we all know that accidents happen at all beaches, and that's, I submit, what may have happened here. Just a freak accident on a normal day with 20 people in the water beside him, Mr. Samuel's happened to take on a bad turn with the wave. What's your closest case, you think, and point to this situation here? I think there are a couple. I think the Isbell case, which goes to the cruise line's duty and how it extends to their passengers that go ashore for excursions. That's the snake bite case. That's the snake bite case, yes, Your Honor. I would liken the wave to a snake. It's a naturally occurring hazard. I also think the Seminoe case where the gentleman that was injured in that beach case in New York had been swimming in the area before, including that morning, and the court pointed out that he had experienced the conditions. So who is more better readily able to determine the safety, the person swimming 20 minutes before or a cruise line that takes passengers around the world? Is there a single United States Court of Appeals decision in this area that you found? In other words, the obligation of a cruise line to passengers for accidents off the ship? No, Your Honor. If there were, I would have cited them, and I think Mr. Geisens would have as well. It's just odd to me with all the cruise lines and all the accidents that's in a single federal court of appeals case ever. Most of the cases are litigated down in Florida, and we do cite some trial court decisions. And they never appeal to the Eleventh Circuit. Right. Okay. And just to touch on one final point that was raised during the earlier argument, I think the exclusion of the experts was proper here. The trial court, Judge Lasnik, found no evidence from these experts that they were qualified to render expert opinion on the issues. There was no training, no knowledge, no experience in beach safety. These were people that happened to work in the travel business, if you will. And Mr. Hutchison, while he may have at one point had some knowledge of the cruise industry, had no present knowledge, made no inquiries other than hunting around on the Internet, which I did as well, and that would not qualify me as an expert on beach safety. Likewise, Ms. Larson is a retired travel agent with absolutely no support in her affidavit for her just broad opinion that it's known to be an unsafe beach. To read Ms. Larson's declaration is to assume that essentially you can't swim in the Pacific Ocean while you're in Mexico. And we all know that's not the case. So I think that the... She had this interesting theory that because this is the land's end, that the waves where the ocean meets the Sea of Cortez, you know, although maybe she's not a hydraulic wave mechanics expert, but she sounds like she is. Yeah, there's no evidence that she has any training in that regard. Mr. Hutchison, who was deposed, acknowledged that he did not have any training in that area as well. In conclusion, I would say that the district court here properly exercised his authority to exclude these experts. As you know, he is entitled to considerable leeway in making those determinations, and I would submit that the appellant has not shown clear error of judgment here, which is the standard that's required, and that his conclusion that the cruise line did not have a duty to warn of open and obvious hazards, particularly where those hazardous conditions had not resulted, to their knowledge, in any prior accidents was correct and should be affirmed. Thank you. Thank you. Mr. Guy, since we kept you busy with questions, we'll give you one minute, but not more than that. Thank you, Your Honor. I would just say, Your Honor, that I clearly agree with the Seminole case that we talked about because they're the person that experienced the water and had an understanding of what was taking place, and he did have the best knowledge of whether that was safe or not under those circumstances. But in this particular case, what is of concern to me is that, and I will say it's an unusual, you know, in my life I haven't run across a case in trying to prove certain things in this fashion, but to me, this lady, Ms. Larson, and she is correct, it's where two oceans come together, basically, the point of Baja Peninsula, and that can create, I'm sure, unusual currents and upwellings and tidal changes that are unusual, where you have a flat beach that's just approached by one body of water. But all these people, whether it's the Internet or whether it's Ms. Larson or whether it's Mr. Hutchison, all these people have knowledge of this, and it's clear what people say about this. And I'm not going to try to use the Internet as an expert, but these people have been sending people down there for years, and their concern and their knowledge from their companies and from their industry was to warn people to be careful on this specific side of the beach. Although it seems like, based on all that, you'd have some evidence in there from somebody that would say, look, there have been 1,000 people that have been injured at this lover's beach on the Pacific side, and you don't have evidence of a single person other than your own client. In the record, that's true. Yes. Thank you. Thank you. We thank both counsel for the argument. The case just argued is submitted.
judges: Gilman (6th Cir.), Clifton, Nr Smith, Cjj